# EXHIBIT 20

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

**CHARLESTON DIVISION**

| | |
|---|---|
| RIDGEWOOD WATER<br><br>          Plaintiff,<br>   v.<br><br>3M COMPANY, E.I. DU PONT DE NEMOURS & COMPANY, THE CHEMOURS COMPANY, HONEYWELL INTERNATIONAL INC., TYCO FIRE PRODUCTS LP, CHEMGUARD INC., BUCKEYE FIRE EQUIPMENT COMPANY, NATIONAL FOAM, INC., AND DOES 1-50, INCLUSIVE.<br><br>          Defendants. | MDL No. 2:18-mn-2873-RMG<br><br>This Document Relates to No. 2:19-cv-02198-RMG<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF RIDGEWOOD WATER'S MOTION TO REMAND**[1] |

---

[1] Pursuant to this Court's prior case management orders, Co-Lead Counsel has authorized the filing of this motion. Counsel for Plaintiff Ridgewood Water also conferred with Defendants' counsel prior to the filing of this motion pursuant to Local Rule 7.02. Defendants oppose the motion.

# TABLE OF CONTENTS

I.      INTRODUCTION....................................................................................................... 1

II.     BACKGROUND ........................................................................................................ 2

    A.    Procedural Posture .............................................................................................. 2

    B.    Statement of Facts............................................................................................... 3

    C.    Overview of Defendants' Incorrect Factual Assertions ............................................. 5

III.    ARGUMENT ........................................................................................................ 10

    A.    Legal Standard ................................................................................................. 10

    B.    Ridgewood's Disclaimer Overcomes Defendants' Purported Basis for Removal .. 11

    C.    Defendants Do Not Meet the Removal Requirements Under 28 U.S.C. § 1442 ..... 12

        1.    Defendants Were Not "Acting Under" a Federal Officer When They
            Manufactured and Sold AFFF and Other PFAS Products ............................. 13

            i.    Manufacture and Use of MilSpec AFFF Does Not Satisfy the "Acting
                Under" Requirement................................................................................ 14

            ii.   Commercial AFFF Has No Relevance to Federal Officer Jurisdiction ... 17

        2.    There Is No Causal Nexus Between The Manufacture and Sale of MilSpec
            AFFF and Ridgewood's Injuries.................................................................... 19

        3.    Defendants Have No Colorable Federal Contractor Defense ........................ 23

IV.    CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

### Cases

*Ayo v. 3M Co.*,
  No. 18-CV-0373(JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) .................. passim

*Bailey v. Monsanto Co.*,
  176 F. Supp. 3d 853 (E.D. Mo. 2016) .................................................................................. 24

*Baran v. ASRC Fed. Mission Sols.*,
  No. CV 17-7425(RMB/JS), 2018 WL 3054677 (D.N.J. June 20, 2018)................................ 13

*Bennett v. Bally Mfg. Corp.*,
  785 F. Supp. 559 (D.S.C. 1992)............................................................................................ 10

*Boyle v. United Techs. Corp.*,
  487 U.S. 500 (1988).............................................................................................................. 23

*Davis v. Wells Fargo*,
   824 F.3d 333 (3d Cir. 2016) ................................................................................................ 23

*Fidelitad, Inc. v. Insitu, Inc.*,
  904 F.3d 1095 (9th Cir. 2018) .......................................................................... 14, 15, 16, 17

*Hagen v. Benjamin Foster Co.*,
  739 F. Supp. 2d 770 (E.D. Pa. 2010) ................................................................................... 23

*In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia*,
   790 F.3d 457 (3d Cir. 2015) ................................................................................. 19, 20, 22

*Kelly v. Monsanto Co.*,
  No. 4:15 CV 1825 JMB, 2016 WL 3543050 (E.D. Mo. June 29, 2016) ........................... 21, 22

*Leite v. Crane Co.*,
  749 F.3d 1117 (9th Cir. 2014) ............................................................................................. 12

*Lu Junhong v. Boeing Co.*,
  792 F.3d 805 (7th Cir. 2015) ............................................................................................... 17

*Mesa v. California*,
  489 U.S. 121 (1989).............................................................................................................. 12

*Mulcahey v. Columbia Organic Chem. Co.*,
  29 F.3d 148 (4th Cir. 1994) ................................................................................................. 10

*Mullinex v. Air & Liquid Systems Corporation*,
  No. 4:18cv33, 2018 WL 7170120 (E.D. Va. Dec. 6, 2018) ................................................. 19

*Papp v. Fore-Kast Sales Co.*,
  842 F.3d 805 (3d Cir. 2016) ........................................................................................... 13, 23

*Ramey v. Martin-Baker Aircraft Co. Ltd.*,
  874 F.2d 946 (4th Cir. 1989) ............................................................................................... 23

*Ripley v. Foster Wheeler LLC*,
    841 F.3d 207 (4th Cir. 2016) ........................................................................... 12, 19, 23

*S C v. Boehringer Ingelheim Roxane, Inc.*,
    No. 3:07-cv-00665-CMC, 2007 WL 1232156 (D.S.C. Apr. 26, 2007) .................................... 10

*Shamrock Oil & Gas Corp. v. Sheets*,
    313 U.S. 100 (1941) ........................................................................................ 10

*Vedros v. Northrop Grumman Shipbuilding, Inc.*,
    No. CIV.A. 2:11-67281-ER, 2012 WL 3155180 (E.D. Pa. Aug. 2, 2012) .............................. 23

*Washington v. Monsanto Co.*,
    274 F. Supp. 3d 1125 (W.D. Wash. 2017) ........................................................... 11, 12

*Watson v. Philip Morris Cos.*,
    551 U.S. 142 (2007) ............................................................................ 13, 14, 15, 16

**<u>Statutes</u>**

28 U.S.C. § 1442 ................................................................................... passim

## I.    INTRODUCTION

Plaintiff Ridgewood Water ("Ridgewood") filed its action in the Superior Court of New Jersey to recover the costs of removing toxic perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS") (collectively, "PFAS") from its public drinking water supply wells. Ridgewood *has disclaimed* any injury from sources required to use military-specification aqueous film-forming foam ("MilSpec AFFF") or from any actions taken under federal government control. Despite this explicit disclaimer, Defendants have wrongly removed this case. Defendants' removal was improper for three principal reasons.

First, Ridgewood's disclaimer makes federal officer jurisdiction non-existent. PFOA and PFOS are used in a myriad of industrial processes and products separate and apart from AFFF. Of course, PFOA and PFOS were also historically present in certain off-the-shelf AFFF products used by non-federal agencies and in MilSpec AFFF used at federally-regulated facilities—the latter of which is the singular, purported basis for Defendants' removal. However, *Ridgewood's claims do not arise from AFFF formulated or sold at the federal government's behest, nor from any PFOA or PFOS release site where MilSpec AFFF would have been required by federal directive*. As made clear in its complaint, Ridgewood expressly disclaims any injuries or claims of liability arising from MilSpec AFFF released at sites where that product was used under federal directive.

Ridgewood explicitly disclaims these injuries by stating that it "has diligently investigated known and potential sources of PFAS contamination in the District's wells and water supply," but "cannot identify any military or federally-regulated airport as a source of such PFAS contamination." Ridgewood also expressly alleges "there are no U.S. government military sites or federally-regulated facilities that are release sites/sources of contamination of Ridgewood's wells." Ex. A (Complaint) ¶¶ 68–69. The contamination at issue here is instead due to industrial and consumer manufacture, use, and disposal of *non-AFFF products*. *Id.* ¶¶ 64–67. Because

1

Defendants' removal relies entirely on a purported federal contractor defense, the Court need not delve into such a defense in light of Ridgewood's disclaimer of any injury from federally regulated sources using MilSpec AFFF. The disclaimer eviscerates Defendants' hypothetical defense on its face and disposes of their only assertion of federal jurisdiction.

Second, even if the Court were to assess the plausibility of a potential federal contractor defense, Defendants' allegations fail. In the manufacture and use of MilSpec AFFF, Defendants were not acting under a federal contract or directive to use toxic PFOA and PFOS. Notably, Defendants do not even identify a relevant federal contract in their notice of removal. And, to the extent Defendants manufactured and sold AFFF to third parties (even if that AFFF complied with MilSpec), those commercial products and sales cannot support federal officer removal. Therefore, contrary to Defendants' assertions, Ridgewood was not injured by any Defendants' conduct under the guidance and subjection of a federal officer or under a federal contract.

Third, Defendants urge that Ridgewood's injuries are attributable to PFAS releases from a single federally regulated airport. But they are not. In fact, no federally regulated MilSpec AFFF could reach Ridgewood's wells, and even if it did, Plaintiff disclaims any MilSpec AFFF contribution from the single site Defendants raise, mooting the issue.

Defendants' removal was improper, and this action should be remanded to the Superior Court of New Jersey.

## II.    BACKGROUND

### A.    Procedural Posture

Ridgewood filed its complaint in New Jersey state court on February 25, 2019. *See* Ex. A (Compl.). Defendants Tyco and Chemguard subsequently removed this case to the District of New Jersey purporting only one ground in support—federal officer jurisdiction. Ex. B (Notice of Removal). Thereafter, Defendants transferred the case to this MDL, and Ridgewood opposed

transfer. *See* Ex. C (Conditional Transfer Order 10); Ex. D (Ridgewood's Opposition to Conditional Transfer Order 10). Ridgewood filed a motion to remand in the District of New Jersey while the Judicial Panel on Multidistrict Litigation ("JPML") considered transfer. The motion to remand was fully briefed before the District of New Jersey, but the JPML transferred this case before the remand motion could be heard. *See* Ex. E (Transfer Order). Ridgewood now renews its motion to remand this case to the Superior Court of New Jersey.

**B.    Statement of Facts**

Ridgewood supplies drinking water to more than 60,000 customers in four municipalities in Bergen County, New Jersey. Ex. A (Compl.) ¶ 7. The vast majority of Ridgewood's 52 wells are contaminated with PFOA and PFOS, including at levels that in some cases exceed proposed maximum contaminant levels ("MCL") adopted by the New Jersey Department of Environmental Protection. *See id*. ¶¶ 8, 9, 29. Ridgewood obtains a portion of the water it serves through interconnections with other water utilities, including Suez Water New Jersey and Hawthorne Water Department. *Id.* ¶ 8.

PFOA and PFOS are among the most toxic of a family of manmade chemicals known as perfluorinated compounds. *Id*. ¶ 23. These chemicals, and specifically PFOA and PFOS, are associated with a variety of industrial processes and products, including Teflon and other fluoropolymers, Scotchguard, AFFF, medical devices, carpet coatings, architectural resins, waterproof fabrics, cooking utensils, industrial de-misters, welding equipment, coated fiberglass, wax removers, floor polish, defoamers, wetting agents, and many others. They enter the environment at every stage of their manufacture, use, and disposal. *Id*. ¶ 28. The following diagrams illustrate some sources of PFOA and PFOS contamination in groundwater.



*Major Sources of PFOA Contamination[2]*



*Major Sources of PFOS Contamination[3,4]*

---

[2] *See generally* Prevedouros, et al., *Sources, Fate and Transport of Perfluorocarboxylates*, ENVTL. SCI. & TECH. 40 (2006).

[3] *See generally id.*

[4] "POSF," as distinct from "PFOS" refers to perfluorooctanesulfonyl fluoride, a precursor to PFOS. Chemicals made from POSF can degrade to PFOS in the environment.

PFOA and PFOS releases that contaminated Ridgewood's wells occurred at diffuse source points, such as industrial and manufacturing facilities and businesses; locations where PFAS-contaminated water is used for irrigation; sites where consumer products are disposed; and possibly sites where commercial AFFF was stored or used. *Id.* ¶ 71. These releases occurred near and contaminated the source waters from which Ridgewood obtains its drinking water supply and have contributed to contamination in Ridgewood's wells. *Id.* ¶¶ 64–67, 71.

But here, to the extent AFFF is a cause of Ridgewood's injuries, it is limited to *commercial* AFFF use by *non-federal consumers* at fire readiness and suppression sites in northern Bergen County, New Jersey. *Id.* ¶¶ 66–67. These sites are located upstream and upgradient of Ridgewood, with a clear and direct pathway for contaminants to migrate to Ridgewood's wells; or near enough that PFOA and PFOS releases would have directly impacted those wells. *See id.* ¶ 67 (citing locations within Ridgewood, in Mahwah, and along Ho-Ho-Kus Brook); *see also* Declaration of David Terry ("Terry Decl.") ¶¶ 16–17. These non-federal sites did not require, and were under no directive to obtain or use, AFFF manufactured to military specification. Ex. A (Compl.) ¶ 41. And most significantly, Ridgewood has disclaimed any injury to its wells from AFFF that was used at any federally regulated or military site. Ex. A (Compl.) ¶ 69 (no such sources contributed to Ridgewood's injuries); *see also supra*, Introduction (express disclaimer).

### C.    Overview of Defendants' Incorrect Factual Assertions

Lacking the federal subjection, guidance, or control necessary to invoke the federal officer removal statute and government contractor defense vis-à-vis the non-federal AFFF release sites that have contaminated Ridgewood's wells, Defendants have resorted to simply imagining federal involvement in Ridgewood's contamination. To do so, Defendants point to a single federally regulated site, Teterboro Airport ("Teterboro") in southeast Bergen County, as a potential MilSpec

AFFF source of PFOA and PFOS in Ridgewood's wells. Ex. B (Not. of Rem.) ¶ 19. Teterboro is subject to a Federal Aviation Administration ("FAA") Airport Certification requirement that certain airports purchase only MilSpec AFFF after 2006.[5] Prior to 2006, Teterboro was not required to comply with MilSpec.[6] While MilSpec has always required that AFFF contain "fluorocarbon surfactants,"[7] of which there are hundreds, it has never required the use of PFOA and PFOS specifically. *See* Ex. B (Not. of Rem.), FAA National Part 139 CertAlert 16-05 § 3.2. Rather, MilSpec imposes performance-based standards that AFFF must meet. *Id.* § 3. So while it is not even certain that Teterboro in fact used AFFF containing PFOA or PFOS, Defendants assert that PFOA and PFOS were released at Teterboro, then migrated to Oradell Reservoir and to Ridgewood's subsurface, eventually contaminating Ridgewood's wells. Ex. B (Not. of Rem.) ¶¶ 21–22.

But there is no pathway for contaminants to migrate from Teterboro to Ridgewood either directly or via the water redistribution network in northern New Jersey. Figure 1 from the Declaration of David Terry (reproduced below) illustrates this point by locating Ridgewood, Teterboro, and elements of the water redistribution network in relation each other and the prevailing groundwater gradient.

---

[5] FAA National Part 139 CertAlert 16-05 § 3(a) (Sept. 1, 2016). While a recent case left open the possibility that a colorable government contractor defense could exist for purposes of federal officer removal where PFAS contamination originated at a facility required to purchase only Milspec AFFF, that is not the case here. Ridgewood does not concede that any such contamination is present in its wells. And Ridgewood contests that the government contractor defense even applies, let alone that it would be meritorious even if applied. *See Ayo v. 3M Co.*, No. 18-CV-0373(JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018).
[6] *Id.* § 2.
[7] *See* Military Specification: Fire Extinguishing Agent, Aqueous Film Forming Foam (AFFF) Liquid Concentrate, Six Percent for Fresh and Seawater, MIL-F-24385 (1969).



*Map of Ridgewood, Teterboro, and Surrounding Features*[8]

---

[8] Terry Decl., Figure 1.

As shown, the groundwater gradient—the direction groundwater and contaminants in the groundwater flow—in northern New Jersey is toward the south. Terry Decl. ¶¶ 16–17, Figure 1. Teterboro is located approximately eight miles south-southeast of Ridgewood, and approximately seven miles south of Oradell Reservoir. *Id*. ¶ 14. Thus, PFOA and PFOS released from Teterboro to the subsurface would flow *away* from both Oradell Reservoir, from which Ridgewood has imported water in the past; and *away* from Ridgewood itself. *Id*. ¶¶ 17–19. PFOA and PFOS would not flow toward those water sources; in fact, it would be physically impossible. *Id*. ¶ 17. Defendants' assertion that PFOA and PFOS have flowed through groundwater to Oradell Reservoir is simply wrong: Teterboro cannot have contributed to contamination in Ridgewood via direct groundwater transmission to Ridgewood or to Oradell Reservoir. Terry Decl. ¶¶ 18, 21.

Second, there are no surface or groundwater sources that capture water impacted with Teterboro's discharges and then introduce that water into any water redistribution network. The water resources near Teterboro are impacted by historic contamination and tidal salinity, which render them unsuitable as drinking water sources. *Id*. ¶ 22. As such, the water capture infrastructure in that portion of New Jersey is limited. Figure 2 from the Declaration of David Terry (reproduced below) shows the absence of community water supply wells that could contribute water with PFOA or PFOS from Teterboro to a drinking water redistribution system.



*Wells Near Teterboro Airport*[9]

---

[9] Terry Decl., Figure 2. "Non-Community" wells depicted in the figure are not connected to any
public drinking water redistribution system.

Figure 2 makes clear that there are no public drinking water supply wells that capture contaminated water from Teterboro. *Id*. Moreover, there are no surface water intakes on the Hackensack River or any nearby water bodies that capture PFOA or PFOS emanating from Teterboro. *Id*. ¶ 25, 26. Defendants' opposite "factual" assertions are again false: there are no discharges from Teterboro contaminating Oradell Reservoir or the Suez Water system that could account for PFOA and PFOS contamination in Ridgewood's wells. Terry Decl. ¶¶ 24–26.

Finally, Defendants evince a false equivalency between a Saint-Gobain Performance Plastics facility ("Saint-Gobain") in Wayne, New Jersey, and Teterboro Airport, suggesting that because the two sites are similar distances from Ridgewood, they must both contribute to Ridgewood's contamination. Ex. B (Not. of Rem.) ¶ 23. This assertion ignores hydrological reality. Terry Decl. ¶ 29. There is a plausible pathway for contaminant migration from Saint-Gobain to Ridgewood via surface water and redistribution. *Id*. ¶¶ 27–28. As discussed above, there is no such pathway from Teterboro to Ridgewood. *Id*. ¶¶ 21, 24, 25.

## III.    ARGUMENT

### A.    Legal Standard

As the removing party, Defendants bear the burden of establishing federal jurisdiction. *Mulcahey v. Columbia Organic Chem. Co.,* 29 F.3d 148, 151 (4th Cir. 1994); *see also Bennett v. Bally Mfg. Corp.,* 785 F. Supp. 559, 560 (D.S.C. 1992). The Court must strictly construe removal jurisdiction because it "raises significant federalism concerns." *Mulcahey*, 29 F.3d at 151 (citing *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100 (1941)); *see also S C v. Boehringer Ingelheim Roxane, Inc.,* No. 3:07-cv-00665-CMC, 2007 WL 1232156, at * 1 (D.S.C. Apr. 26, 2007). Any doubt regarding this Court's jurisdiction should weigh in favor of remanding to state court. *Mulcahey,* 29 F.3d at 151.

**B.    Ridgewood's Disclaimer Overcomes Defendants' Purported Basis for Removal**

Defendants' only ground for removal is a potential federal contractor defense. *See generally* Ex. B. (Not. of Rem). The Court need not look beyond Ridgewood's Complaint to invalidate this removal ground. Simply, Ridgewood has disclaimed injury from sources using MilSpec AFFF or from AFFF used under federal directive—the only allegations that underlie Defendants' attempt to remove this action. *See* Ex. A (Compl.) ¶¶ 68–69 (After diligent investigation, Ridgewood "cannot identify any military or federally regulated airport as a source of such PFAS contamination."). Ridgewood also expressly alleges that "there are no U.S. government military sites or federally regulated facilities that are release sites/sources of contamination of Ridgewood's wells." *Id.*; *see also* Introduction, *supra*. Such federally regulated sources are the only foundation on which a federal contractor defense could sit. And, one federally regulated airport at which MilSpec AFFF could have been used is the only basis for Defendants' assertion of a federal contractor defense. *See* Ex. B (Not. of Rem.).

Courts have found a plaintiff's disclaimer of injuries that might otherwise support potential federal jurisdiction sufficient to render removal improper, even where the disclaimer is not explicit in the complaint itself—which Ridgewood's is—but is nonetheless clear from the allegations therein. *Washington v. Monsanto Co.*, 274 F. Supp. 3d 1125 (W.D. Wash. 2017), is instructive. There, Monsanto removed the State of Washington's claims that Monsanto "contaminat[ed] water, land, and wildlife throughout the state's territory with toxic chemicals called polychlorinated biphenyls ('PCBs')" that Monsanto manufactured. *Id.* at 1127. Monsanto argued in relevant part that some of the allegedly contaminated waters "are 'at or near' federal territories, including military bases," and that injuries to those waters would give rise to federal question jurisdiction under the federal enclave doctrine. *Id.* at 1132. The State moved to remand, "assert[ing] that it

11

d[id] not seek damages for contamination to waters and land within federal territory, as it would not have standing to do so." *Id.* That representation satisfied the court that "because Washington avowedly does not seek relief for contamination of federal territories, none of its claims arise on federal enclaves," and the court therefore granted the State's motion to remand. *Id.*

Similarly here, the Complaint alleges that Ridgewood's injuries arise from conduct by Defendants that unquestionably could not give rise to federal officer jurisdiction, namely the manufacture of PFOA- and PFOS-laden products other than MilSpec AFFF, and Ridgewood specifically disclaims injuries from federally mandated MilSpec AFFF. Compl. ¶ 69. The Complaint simply does not allege the harms Defendants rely on, and Defendants cannot contort its allegations to fit their theory of federal jurisdiction.

As such, Ridgewood's disclaimer of the very injuries to which a hypothetical federal contractor defense would apply negates Defendants' only removal argument. The Court should remand on this fact alone.

### C.    Defendants Do Not Meet the Removal Requirements Under 28 U.S.C. § 1442

Even if the Court were to assess the merits of removal based on a federal contractor defense, Defendants have not and cannot satisfy the requirements of the federal officer removal statute. *See* 28 U.S.C. § 1442. A removing party asserting federal officer jurisdiction must demonstrate "(1) it is a federal officer or a person acting under that officer; (2) a colorable federal defense; and (3) the suit is for an act under color of office, which requires a causal nexus between the charged conduct and asserted official authority." *Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 209–10 (4th Cir. 2016); *see also Mesa v. California*, 489 U.S. 121, 124–25, 129–31, 133–35 (1989). The removing party "may not offer mere legal conclusions," but "must allege the underlying facts supporting each of the requirements for removal jurisdiction." *Leite v. Crane Co.*,

749 F.3d 1117, 1122 (9th Cir. 2014) (cited with approval in *Papp v. Fore-Kast Sales Co.,* 842 F.3d 805, 811 (3d Cir. 2016)).

Ridgewood acknowledges that Defendants are "persons" within the meaning of § 1442. However, Defendants cannot satisfy any of the remaining elements. Ridgewood's injuries did not arise from federally mandated MilSpec AFFF, the only product that Defendants could arguably claim were manufactured "acting under" an officer of the United States. In turn, none of Ridgewood's claims relate to any act taken by any defendant under color of federal office. And because the alleged tortious conduct did not arise from or relate to any federal contract for MilSpec AFFF—the only federal contracts on which Defendants rely—Defendants cannot present a colorable government contractor defense.

### 1. Defendants Were Not "Acting Under" a Federal Officer When They Manufactured and Sold AFFF and Other PFAS Products

A private defendant may only remove under 28 U.S.C. § 1442 when its alleged conduct was done "acting under" an officer of the United States. The words "acting under" are construed liberally, but the Supreme Court has cautioned that the statute's "broad language is not limitless." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007). In particular, "where a private actor seeks the benefit of the federal officer removal statute, there must be some relationship between the government and the private actor beyond that of 'regulator/regulated.'" *Baran v. ASRC Fed. Mission Sols.*, No. CV 17-7425(RMB/JS), 2018 WL 3054677, at *5 (D.N.J. June 20, 2018). "[P]recedent and statutory purpose make clear that the private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 152 (emphasis in original).

### i.  Manufacture and Use of MilSpec AFFF Does Not Satisfy the "Acting Under" Requirement

Defendants here allege that they were and are acting under federal direction and control by "designing, manufacturing, and supplying the MilSpec AFFF products at issue, . . . in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, and labeling." Ex. B (Not. of Rem.) ¶ 27. But that argument misreads and misconstrues Ridgewood's complaint. Ridgewood has expressly alleged that after diligent investigation, it has determined "no U.S. government military sites or federally-regulated facilities [including airports] are release sites/sources of contamination of Ridgewood's wells." Ex. A (Compl.) ¶¶ 68–69. Ridgewood alleges that its injuries arise from industrial facilities where non-AFFF products containing PFOA and PFOS were used, *see id*. ¶ 65, from disposal of a myriad of industrial and consumer products, and from fire suppression and fire-fighting training activities that were not subject to the regulations Defendants cite requiring the use of MilSpec AFFF, *see id*. ¶¶ 66–67. Defendants' design, manufacture, and sale of non-AFFF products and AFFF to non-federal consumers did not "involve an effort to *assist*, or help *carry out*, the duties or tasks for a federal superior," and Defendants do not argue otherwise. *See Watson*, 551 U.S. at 152.

*Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095, 1100 (9th Cir. 2018), is instructive. There, the removing defendant designed and manufactured "unmanned aerial systems—commonly known as 'drones'—that it s[old] to military and civilian customers." *Id*. at 1097. The plaintiff, a "reseller of [the defendant's] drones in Latin America," sued the defendant alleging the manufacturer breached contracts associated with drone sales in Colombia. *Id*. The seller plaintiff "made several sales of [the manufacturer defendant's] drones to the Colombian Air Force and the United States Military in Colombia (for end use by the Colombian military)." *Id*. at 1098. The manufacturer, of its own

volition, delayed fulfilling the orders and asked the seller to clarify and perfect export licenses the seller was required to obtain from the United States. The defendant ultimately filled some orders by allowing the "United States [to] take title to the drones in this country and export them to Colombia itself, making the export licenses unnecessary." *Fidelitad*, 904 F.3d at 1098. After filling those orders, the manufacturer refused to do further business with the seller and began making direct sales to some of the seller's Colombian customers. *Id.* The seller sued in Washington state court alleging breach of an oral distributorship agreement, and breach of the sales contracts for the drones destined for the Colombian Air Force. *Id.* The manufacturing defendant removed, asserting federal officer jurisdiction under 28 U.S.C. § 1442. *Id.* at 1097–98.

The manufacturer defendant argued in relevant part that it was "acting under" a federal officer when it delayed fulfilling the plaintiff's purchases because it was "attempting to enforce specific provisions in [plaintiff's federally mandated] export licenses," and because some of the products were exported to Colombia while the U.S. government held title to them and were ultimately purchased by the U.S. government for sale to the Colombian air force. *Id.* at 1100–01. The Ninth Circuit rejected both arguments, holding that "[n]o federal officer directed [the defendant] to delay [the plaintiff's] orders or cease doing business with [the plaintiff]" or delegated authority to the defendant to enforce the federal licenses, and that "the government did not contract with [the defendant] for the equipment at issue," but rather *the plaintiff* purchased them directly from defendant. *Id.* at 1100–01. The defendant had therefore not "acted pursuant to a directive in any federal contract," and the "export licenses d[id] not 'establish the type of formal delegation that might authorize [the defendant] to remove the case.'" *Id.* at 1101 (quoting *Watson*, 551 U.S. at 156). It made no difference that the defendant also manufactured and sold similar drones directly to the United States, or that the defendant's sales to the plaintiff were ultimately

"helping the government achieve foreign policy objectives" by providing equipment to the Colombian military. *See Fidelitad*, 904 F.3d. at 1101 n.3. The manufacturer defendant could only take advantage of the federal officer removal statute had it been "'helping the Government to produce an item that it needs' pursuant to a federal contract." *Id.* (quoting *Watson*, 551 U.S. at 153). Because the manufacturer defendant "did not act pursuant to a contract with the federal government" in its conduct toward the seller plaintiff, removal was improper. *Id.*

The facts here are closely analogous to those in *Fidelitad*. Defendants manufacture AFFF that they sell to both government and civilian customers, and which are subject to specifications *when purchased by the government* or for use at certain federally regulated airports or military facilities. These specifications have no bearing on Defendants' sales to purchasers other than the government. Just as in *Fidelitad*, Ridgewood's injuries here do not stem from directives in any federal contract between it and any Defendant, or any instruction to a Defendant from a federal superior. Ridgewood has alleged injuries from PFOA- and PFOS-laden products *excluding* federally-mandated MilSpec AFFF, has specifically disclaimed injuries attributable to MilSpec AFFF released at federal or federally regulated facilities, and has presented evidence rebutting Defendants' unfounded assertions that PFOA and PFOS reached its water system from sources required to use MilSpec AFFF. *See* Part I.C, *infra*.

Moreover, any AFFF that complied with MilSpec or other federal requirements was regulatory in nature, not contractual. Regulators of Teterboro have no contractual interest in the AFFF used there because it was purchased by Teterboro operators and not the federal government. Thus, there is no "evidence of any contract, any payment, any employer/employee relationship, or any principal/agent arrangement" to establish that Defendants were "acting under" federal authority in supplying AFFF (MilSpec or otherwise) for use at Teterboro. *See Watson*, 551 U.S. at

156; *see also Fidelitad,* 904 F.3d at 1100-01 n.3 (acting under removal jurisdiction was absent because "the government did not contract with [the defendant] for the equipment at issue. . . . and [the defendant] did not act pursuant to a contract with the federal government."). Accordingly, because any use of AFFF at Teterboro would have been regulatory, defendants were not "acting under" federal authority. *See Lu Junhong v. Boeing Co*. 792 F.3d 805, 808-10 (7th Cir. 2015) (duty to comply with FAA regulations held insufficient to show that product manufacturer was "acting under" federal authority).

### ii.    Commercial AFFF Has No Relevance to Federal Officer Jurisdiction

To the extent Defendants used PFOA and PFOS in formulating commercial AFFF and other products, and then sold those products to customers who are not required to purchase AFFF that meets MilSpec standards (e.g., the Ridgewood Fire Department), "[n]o federal officer directed" the formulation or sales of that AFFF. *See Fidelitad*, 904 F.3d at 1099. Similarly, the only purported federal contracts Defendants reference are those ostensibly governing sales of MilSpec AFFF to entities mandated under federal regulations to purchase products appearing on the DOD Qualified Products Listing. Ex. B (Not. of Rem.) ¶ 35. But Ridgewood's injuries, to the extent they were caused by AFFF among the myriad other sources of PFAS, are attributable to AFFF provided to entities or individuals under no such mandate. Ex. A (Compl.) ¶¶ 67–69. There was no government contract between Defendants and PFOA/PFOS releasors here. Thus, as in *Fidelitad*, "the government did not contract with [Defendants] for the equipment at issue," and the third-party users of PFOA- and PFOS-laden products "ordered the [products] directly from [Defendants]," without any subjection, guidance, or control from the federal government. *See* 904 F.3d at 1101.

The recent decision in *Ayo v. 3M Company*, Case No. 18-cv-0373(JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018), on which Defendants rely, actually illustrates Ridgewood's point. The individual plaintiffs there sued in New York state court, alleging that they were exposed to PFOA and PFOS in drinking water drawn from an aquifer "close to and downgradient of the Gabreski Air National Guard Base . . . which is part of the Francis S. Gabreski Airport." *Id.* at *2. The plaintiffs alleged that "for decades the [New York Air National Guard ha[d] used a half-acre Airport Fire Training Area located at the Airport" where it applied MilSpec AFFF, and that the manufacturer defendants had "failed to warn the U.S. Department of Defense ('DoD'), the U.S. Air Force, Gabreski, municipal water suppliers, and residents of the Communities of the dangers posed by their AFFF products." *Id.* The defendants removed under 28 U.S.C. § 1442, on the same basis as Defendants here. *Id.* at *6. But critically, the *Ayo* plaintiffs *expressly alleged that they were injured by MilSpec AFFF sold to and used by the United States military at a facility leased to the United States military*.[10] On those facts, the court found that the defendants arguably (for purposes of removal) were acting under federal superiors insofar as they "help[ed] the government develop a product at the government's request," and "[t]hrough contracts with the government, . . . formulated, produced, and supplied these essential AFFF products *to the military*." *Id.* at *8–9 (emphasis added). Here, Plaintiff does not allege any injury traceable to a product supplied to the military, or manufactured or sold at the government's request, and indeed, has expressly

---

[10] *See, e.g.*, *id.* at *3 ("Plaintiffs aver that the decades of use, storage, and disposal of Manufacturing Defendants' PFC-based AFFF products at Gabreski have caused the chemicals to enter the groundwater and contaminate the Aquifer."); ("According to Plaintiffs, AFFF was introduced commercially in the mid-1960s, but 'AFFF sold to the United States military'—'[u]nlike commercial AFFF formulations'—'must conform to the military-specific performance and quality control measurements as prescribed by the military specification ('Mil-Spec') Mil-F-24385.");" *id.* at *9 (quoting the plaintiffs' allegation "that Manufacturing Defendants 'regularly contract with . . . the DOD, the [U.S. Air Force], specific installations, and/or third-party logistic intermediaries, to sell and deliver AFFF to bases throughout the country, including to Gabreski'").

18

disclaimed any such injury. Unlike in *Ayo*, where the plaintiffs had to confront a clear case of government involvement in the PFOA and PFOS releases, Defendants here simply do not have a factual basis to assert they "acted under" a federal officer.

Put simply, no federal officer directed Defendants to incorporate PFOA or PFOS into products supplied to non-federal consumers, and those other products are the sources of Ridgewood's injuries. As such, Defendants cannot satisfy section 1442's "acting under" element.

### 2. There Is No Causal Nexus Between The Manufacture and Sale of MilSpec AFFF and Ridgewood's Injuries

To satisfy federal office jurisdiction, the removing defendant must establish that "'the suit is *for* a[n] act under colors of the office,' which requires a causal nexus 'between the charged conduct and asserted official authority.'" *Ripley*, 841 F.3d at 209 (internal citation omitted and emphasis and alteration in original). To meet the causal nexus element, the removing defendant must demonstrate a "connection or association" between the act in question and the federal office. *Mullinex v. Air & Liquid Systems Corporation*, No. 4:18cv33, 2018 WL 7170120 at *20 (E.D. Va. Dec. 6, 2018); *see also In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 471 (3d Cir. 2015), *as amended* (June 16, 2015) ("*Def. Ass'n of Philadelphia*").

Defendants cannot establish the requisite causal nexus for two reasons. First, as discussed above, Ridgewood has disavowed any connection between its injuries and Defendants' manufacturing and supplying MilSpec AFFF to the federal government or any entity subject to a federal regulation requiring it to use MilSpec AFFF. The injurious conduct actually alleged— Defendants' design, manufacture, and sale of PFOA and PFOS products, including commercial

AFFF to non-federal users—has no "'connection' or 'association'" to any "federal office." *See Def. Ass'n of Philadelphia*, 790 F.3d at 471.[11]

Second, even if Ridgewood had not excluded federally mandated MilSpec AFFF from the scope of its alleged injuries, the factual allegations in Defendants' Notice of Removal attempting to tie Ridgewood's PFOA and PFOA contamination to MilSpec sources do not withstand even the slightest scrutiny. Defendants allege *only on information and belief* that MilSpec AFFF has been used at Teterboro since at least 2006, that "the flow of groundwater in that area of New Jersey is generally in the direction running from the airport to" Oradell Reservoir and other collection sources for Suez Water, and that therefore Teterboro "is a source of the alleged PFOA and/or PFOS contamination that gives rise to Plaintiff's claims." Ex. B (Not. of Rem.) ¶¶ 17–22. Those allegations are demonstrably false.

As explained in the Declaration of hydrogeology expert David Terry, groundwater in the area of Teterboro does not flow toward Oradell Reservoir, which sits eight miles north-northwest of the airport. Terry Decl. ¶¶ 14–19. Instead, the groundwater beneath Ridgewood, Oradell Reservoir, and Teterboro generally flows south toward the southerly flowing Berry's Creek, a tributary to the Hackensack River, which in turn flows south into Newark Bay. *Id.* ¶¶ 17–19. Because "[g]roundwater contaminants that enter subsurface aquifers generally move with the prevailing groundwater flow direction," any PFOA and PFOS released at Teterboro due to MilSpec AFFF use would flow "toward the Hackensack River and ultimately to Newark Bay—

---

[11] The *Ayo* case is again distinguishable. The court there found the causal connection element satisfied because "[c]rediting Manufacturing Defendants' theory of the case, the use of [PFAS] 'occurred *because of* what they were asked to do by the Government'—to design and manufacture Mil-Spec AFFF products . . . ." *Ayo*, 2018 WL 4781145 at *9. Here, Plaintiff's injuries were not caused by any federally-mandated MilSpec AFFF products, and as such do not arise from anything Defendants "were asked to do by the Government."

away from Oradell Reservoir" and *away* from Ridgewood. Terry Decl. ¶¶ 18–20. Mr. Terry concludes: "As such, subsurface transmission of PFOA and PFOS to Ridgewood either directly or via Oradell Reservoir is not a viable mechanism to account for the contamination in Ridgewood's wells." *Id.* ¶ 21.

Water imported to Ridgewood via water redistribution systems also cannot support Defendants' allegations that Teterboro is a source of Ridgewood's PFOS and PFOA contamination. For one thing, there are no public drinking water supply wells near Teterboro Airport that contribute to the water redistribution network, because the groundwater there is too saline and too impacted by historic pollution to be potable; and the nearest public drinking water supply wells are all north of—and upgradient from—Teterboro. *Id.* ¶¶ 22–24. "Because there are no wells pumping groundwater from areas of the aquifer impacted by Teterboro Airport PFOA and PFOS releases, there is no possibility that PFOA and PFOS in Oradell Reservoir originated from groundwater extraction at or near Teterboro Airport." *Id.* ¶ 24.

Moreover, while Suez Water gathers some of its drinking water from surface intakes on the Hackensack River system, all of those intakes are *upriver and upgradient* from Teterboro and thus cannot be "affected by PFOA or PFOS emanating from Teterboro Airport." *Id.* ¶ 25. For that reason, "PFOA and PFOS emanating from Teterboro Airport therefore does not enter Suez Water's redistribution infrastructure via surface water intakes," *id*. ¶ 26, and have not been imported to or caused contamination in Ridgewood's wells.

The court rejected federal officer removal and granted remand on analogous facts in *Kelly v. Monsanto Co.,* No. 4:15 CV 1825 JMB, 2016 WL 3543050, at *9 (E.D. Mo. June 29, 2016). There, a predecessor to the defendants manufactured polychlorinated biphenyls ("PCBs"), which it sold "to numerous industrial customers, for a wide variety of industrial uses." *Id.* at *1–2. The

plaintiffs sued in state court alleging that PCBs had broadly contaminated air, water, soil, and the food chain, but "'affirmatively disclaim[ed]' any damages or actions arising out of an act of the United States or of any federal officer." *Id.* at *2. The defendants removed under § 1442. *Id.* at *1. The court observed that the evidence before it showed that "although the government required the use of PCBs in certain products and provided financial assistance to Old Monsanto to manufacture PCBs during World War II, Old Monsanto sold the PCBs mostly to government contractors and not to the government itself." *Id.* at *9. Because the proportion of PCB sales to the federal government "would account for less than one one-thousandth of one percent of overall sales of PCBs," the court found that those sales were too insubstantial to satisfy § 1442's causal connection requirement:

> Even accepting as true Defendants' claimed amount of PCBs and indulging all inferences in Defendant's favor, the record establishes the amount of sales of PCBs manufactured by Old Monsanto for open uses pursuant to contracts with the government and sold to federal contractors at the direction of the government relative to the amount of PCBs allegedly persisting in the environment and food chain is too small to satisfy the requirement that there be a causal connection between the conduct that was taken under federal authority and Plaintiffs' claims.

*Id.* at *9. Here, Defendants' sales of MilSpec AFFF to the government, or at the federal government's direction, were not a cause of Ridgewood's claimed injuries—not because they are insubstantial in volume, but because those products are simply not the ones that harmed Ridgewood, which in any case has disclaimed any such injury in this litigation.

The conduct that led to Ridgewood's injuries has no "'connection' or 'association'" with any conduct under federal direction, *see Def. Ass'n of Philadelphia*, 790 F.3d at 471, and the conduct Defendants *do* purport to have completed under federal subjection and control—providing MilSpec AFFF to Teterboro—is not and cannot be a cause of Plaintiff's injuries. Defendants' factual assertions are not entitled to a presumption of truth where, as here, they not only

misconstrue the allegations in the complaint, but are also rebutted by clear evidence that "directly undermine[s] one of the four elements of Section 1442 that must be present to confer jurisdiction . . . ." *Papp*, 842 F.3d at 811, n. 4; *see also Davis v. Wells Fargo*, 824 F.3d 333 (3d Cir. 2016) at 346. Defendants cannot satisfy § 1442's causal connection element.

### 3. Defendants Have No Colorable Federal Contractor Defense

Finally, Defendants must show that they "possess a colorable federal defense." *Ripley*, 841 F.3d at 209. Defendants here assert a federal contractor defense, which requires them to show: (1) the United States established or approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. *See Ramey v. Martin-Baker Aircraft Co. Ltd.*, 874 F.2d 946, 949 (4th Cir. 1989)) (citing *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988)). Courts have held that when a defendant removes under 28 U.S.C. § 1442 on the basis of a purported government contractor defense, "the causal nexus analysis is essentially the same as that associated with the colorable defense requirement." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 785 (E.D. Pa. 2010) (punctuation omitted); *Vedros v. Northrop Grumman Shipbuilding, Inc.*, No. CIV.A. 2:11-67281-ER, 2012 WL 3155180, at *8 (E.D. Pa. Aug. 2, 2012) (same).

The colorable federal defense analysis here collapses into the causal nexus analysis, and fails for the same reason: Defendants argue that they have a federal contractor defense based on the design, manufacture, and sale of MilSpec AFFF to federal entities or at federal direction, but Ridgewood asserts specifically that it is not injured by federally mandated MilSpec AFFF. This distinction, which Defendants seek to obscure, undermines each element of their federal contractor defense under *Boyle*. As to the first element, Defendants assert that "Naval Sea Systems Command

approved reasonably precise specifications, governing AFFF formulation, performance, testing, storage, inspection, packaging, and labeling," citing the MilSpec requirements. Ex. B (Not. of Rem.) ¶ 35. They then aver that Defendants' Tyco and Chemguard's products "appeared on the DOD Qualified Products Listing, which could only have occurred if Naval Sea Systems Command had first determined that they conformed to the MilSpec." *Id.* And finally, they assert that "the government was adequately informed regarding alleged product related 'dangers' . . . to exercise its discretionary authority in specifying and procuring MilSpec AFFF." *Id.* ¶ 36. Each of these allegations turns on the federal government's purchase and use of MilSpec AFFF, which are not the subject of this litigation and not a cause of Ridgewood's injuries.

The *Ayo* decision is again inapposite, precisely because this case does not concern federally mandated MilSpec AFFF. As the *Ayo* court correctly observed, the government contractor defense "provides that a contractor may not be held liable under state law for design defects in equipment *produced for the government*" when the *Boyle* elements are satisfied. *Ayo*, 2018 WL 4781145 at *10 (emphasis added). But the court did not consider—and the decision says nothing about—sales of PFOA or PFOS products to purchasers other than the federal government, which are the only sector of PFOA and PFOS releasors at issue in this case. Defendants here cannot raise a colorable government contractor defense based on such sales. *See also Bailey v. Monsanto Co.*, 176 F. Supp. 3d 853, 870 (E.D. Mo. 2016) (finding the defendant had not presented colorable government contractor defense based on its manufacture and sale of PCBs, because "though the government required the use of PCBs in certain products during the relevant time period, and provided financial assistance to Old Monsanto to manufacture them in the early 1940s, Defendants sold the PCBs, by and large . . . not to the government itself").

Ridgewood does not concede the accuracy of Defendants' allegations concerning the merits of their future government contractor defense, especially their assertion that they adequately warned the United States of the environmental and human health risks from PFOA- and PFOS-laden AFFF.[12] But those facts, even if credited as true and viewed in the light most favorable to Defendants, are a red herring. They do not establish a colorable defense here because they all concern MilSpec AFFF provided under a federal contract, which did not injure Ridgewood. Defendants cannot satisfy this element of § 1442 either, and removal was therefore improper.

## IV.    CONCLUSION

For the foregoing reasons, removal was improper. Ridgewood respectfully requests that the Court remand this case to the Superior Court of New Jersey.

Dated: September 3, 2019                    **SHER EDLING LLP**

By:   */s/ Matthew K. Edling*
_____

Matthew K. Edling
matt@sheredling.com
Victor M. Sher
vic@sheredling.com
Stephanie D. Biehl
stephanie@sheredling.com
Katie H. Jones
katie@sheredling.com

---

[12] Ridgewood's Complaint alleges, to the contrary, that Defendants knew of the environmental and health dangers of PFOA and PFOS for decades and failed to warn consumers or the public. *See* Ex. A (Compl.) ¶¶ 42–63. For that reason and others, Ridgewood vigorously disputes Defendants' reliance on the government contractor defense. Ridgewood acknowledges the *Ayo* court found that for purpose of removal only, the defendants presented evidence supporting a colorable defense based on a relationship between them and the federal government regarding the purchase of MilSpec AFFF, but the court expressly reserved any judgment on the defense's ultimate merits. *See, e.g.*, 2018 WL 4781145 at *10–11. Defendants purport that same relationship exists here. It does not, because Ridgewood disclaims injury from the source on which Defendants' base their inapplicable government contractor defense (and the "facts" Defendants allege to connect the relationship to Plaintiff's injuries defy hydrogeological reality).

Timothy R. Sloane
tim@sheredling.com
100 Montgomery St., Suite 1410
San Francisco, CA 94104
Tel:    (628) 231-2500
Fax:    (628) 231-2929

Matthew S. Rogers
msr@mrogerslaw.com
**LAW OFFICES OF MATTHEW S.
ROGERS, L.L.C.**
123 Prospect Street
Ridgewood, NJ 07450
Tel: (201) 857-3700
Fax: (201) 857-3699

*Attorneys for Plaintiff Ridgewood Water*