# EXHIBIT 21

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| **IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION** | MDL 2:18-mn-2873-RMG<br><br>This Document Relates to<br>No. 2:19-cv-02198-RMG |

**DEFENDANTS' RESPONSE TO RIDGEWOOD'S
MOTION TO REMAND THIS ACTION TO STATE COURT**

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................. 1

ARGUMENT ................................................................................................................................. 3

I.    The Federal Officer Removal Statute Is To Be Construed Liberally in Favor of Removal, and a Defendant Need Only Make Out a "Plausible" Basis for Removal under the Statute. ......... 3

II.    Defendants Have Demonstrated a Plausible Basis for Federal Officer Removal. ................. 5

III.    Ridgewood's Purported Disclaimers Do Not Undermine the Propriety of Removal. ........... 7

IV.    Defendants "Act[ed] Under" Federal Authority in Designing and Manufacturing MilSpec AFFF Used at Teterboro Airport. ............................................................................................... 10

V.    It Is Plausible that PFAS from MilSpec AFFF Used at Teterboro Airport Has Affected Ridgewood's Water Supply and Contributed to Its Claimed Injuries. ......................................... 14

CONCLUSION ............................................................................................................................ 19

# TABLE OF AUTHORITIES

## Cases

*Ayo v. 3M Company*, 2018 WL 4781145, (E.D.N.Y. Sept. 30, 2018)................................. 6, 7, 11

*Ballenger v. Agco Corp.*, 2007 WL 1813821 (N.D. Cal. June 22, 2007) ...................................... 9

*Bennett v. MIS Corp.*, 607 F.3d 1076 (6th Cir. 2010) ................................................................. 13

*Bouchard v. CBS Corp.*, 2012 WL 1344388 (E.D. Pa. Apr. 17, 2012) ........................................ 5

*Boyle v. United Tech. Corp.*, 487 U.S. 500 (1988) ................................................................... 6, 7

*Cuomo v. Crane Co.*, 771 F.3d 113 (2d Cir. 2014)................................................................. 4, 19

*Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095 (9th Cir. 2018)...................................................... 12

*Glassco v. Miller Equip. Co.*, 966 F.2d 641 (11th Cir. 1992)...................................................... 12

*Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567 (2004) ............................................. 7

*Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770 (E.D. Pa. 2010) ......................................... 4

*Hunt v. DeVita, Inc.*, 680 F.3d 775 (7th Cir. 2012) ..................................................................... 8

*In re Asbestos Litig.*, 2016 WL 452309 (D. Del. Feb. 5, 2016)..................................................... 4

*In re Asbestos Prods. Liab. Litig. (No. VI)*, 770 F. Supp. 2d 736 (E.D. Pa. 2011)........................ 9

*Isaacson v. Dow Chem. Co.*, 517 F.3d 129 (2d Cir. 2008) ........................................................... 4

*Jefferson Cnty. v. Acker*, 527 U.S. 423 (1999) ........................................................................ 3, 8

*Kraus v. Alcatel-Lucent*, 2018 WL 3585088 (E.D. Pa. July 25, 2018).......................................... 4

*Machnik v. Buffalo Pumps Inc.*, 506 F. Supp. 2d 99 (D. Conn. 2007) .......................................... 9

*Marley v. Elliott Turbomachinery Co.*, 545 F. Supp. 2d 1266 (S.D. Fla. 2008)............................. 9

*O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51 (D. Mass. 2008) ........................ 9

*Papp v. Fore-Kast Sales Co.*, 842 F.3d 805 (3d Cir. 2016)............................................... 3, 4, 19

*Ripley v. Foster Wheeler LLC*, 841 F.3d 207 (4th Cir. 2016)........................................................ 3

*Sawyer v. Foster Wheeler LLC*, 860 F.3d 249 (4th Cir. 2017) .............................................. 10, 11

*St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283 (1938) ..................................... 7, 8

*Timberline Air Serv., Inc. v. Bell Helicopter-Textron, Inc.*, 884 P.2d 920 (Wash. 1994) ............ 12

*Washington v. Monsanto Co.*, 274 F. Supp. 3d 1125 (W.D. Wash. 2017) ..................................... 9

*Watson v. Philip Morris Cos.*, 551 U.S. 142 (2007) ...................................................... 3, 10, 12, 13

*Willingham v. Morgan*, 395 U.S. 402 (1969) ................................................................................ 3

**Statutes**

14 C.F.R. § 139.1 (2019) ................................................................................................................ 1

28 U.S.C. § 1442 ............................................................................................................................. 1

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff Ridgewood Water ("Ridgewood") filed this case in New Jersey state court, asserting claims based on the alleged presence of per- and poly-fluroalkyl substances ("PFAS"), including but not limited to PFOA and PFOS, in its water supply. Compl. (ECF No. 264-3) ¶ 1. Defendants Tyco Fire Products LP and Chemguard, Inc. ("Defendants"), manufacturers of PFAS-containing AFFF products,[1] removed the action to the District of New Jersey under the federal officer removal statue, 28 U.S.C. § 1442(a)(1). Ridgewood moved to remand in that court, but the court took no action on the motion before the Judicial Panel on Multidistrict Litigation transferred the case to this MDL. Ridgewood now renews the motion in this Court.

The Court should deny the motion. The notice of removal alleges that if Ridgewood's water system contains PFAS, those compounds may have originated in part from the use of MilSpec AFFF at Teterboro Airport in Bergen County, New Jersey—a so-called Part 139 civilian airport that under Federal Aviation Administration directives is required to use MilSpec AFFF.[2] As this Court has already held in denying remand in a case filed by the State of New York ("*NY1*"), Defendants manufacture MilSpec under the specifications and guidance of the U.S. military, and where MilSpec AFFF is a cause of plaintiff's alleged injuries, the case is properly removable under

---

[1] Ridgewood confusingly asserts on the first page of its brief that the contamination at issue here is "due to industrial and consumer manufacture, use, and disposal of *non-AFFF products*." Memo. of Law in Support of Plaintiff Ridgewood Water's Mot. to Remand (ECF No. 264-1) ("Memo.") at 1 (emphasis in original). If that were true, it would be difficult to see why Ridgewood sued several defendants identified as manufacturers of AFFF products, *see* Compl. ¶¶ 14–17, and set forth allegations about their production and commercialization of AFFF, *id.* ¶¶ 35–41.

[2] Part 139 airports are those serving scheduled passenger flights by 9-passenger (or larger) aircraft or unscheduled passenger flights by 31-passenger (or larger) aircraft. *See* 14 C.F.R. § 139.1 (2019).

the federal officer removal statute.  May 24, 2019 Order Denying NY Mot. to Remand (ECF No. 103) ("*NY1* Order").

In arguing for remand, Ridgewood contends, first, that it engineered its Complaint to avoid federal jurisdiction by "disclaiming" any cause of action based on the use of MilSpec AFFF at military bases or federally regulated airports.[3]  But the language it points to in the Complaint is not a disclaimer; it is simply a description of the status of Ridgewood's investigation as of the date of the Complaint.  Ridgewood's *post*-removal statements attempting to renounce claims involving the MilSpec product cannot retroactively defeat removal.  Second, Ridgewood asserts that Defendants were not "acting under" federal authority in producing MilSpec AFFF that was ultimately used at Teterboro Airport, a "non-federal" customer.  (The State of New York, in its pending motion to remand the second of three cases it has filed against AFFF manufacturers, ECF No. 230, raises the same argument.)  That argument fails because, as the Court concluded in *NY1*, Defendants have acted under the authority of the Department of Defense in *designing and manufacturing* MilSpec AFFF.  The fact that the product is later sold for civilian use does not change the "acting under" analysis.  Finally, Ridgewood insists that PFAS from MilSpec AFFF used at the Teterboro Airport could not possibly have migrated into its water supply.  But as alleged in the notice of removal and explained in the declaration of environmental engineer John A. Connor submitted with this brief as Exhibit A, such migration is plausible—and, at this stage, that is all that Defendants are required to show to support federal-officer removal.  The Court should decline Ridgewood's invitation to engage in factfinding on that issue at this early stage of the case.

---

[3]    Ridgewood seeks to avoid federal jurisdiction and this MDL notwithstanding that it is represented by a member of the Plaintiffs' Executive Committee, Matthew Edling.

**ARGUMENT**

**I.    The Federal Officer Removal Statute Is To Be Construed Liberally in Favor of Removal, and a Defendant Need Only Make Out a "Plausible" Basis for Removal under the Statute.**

The Court's Order denying the State of New York's motion to remand in *NY1* sets forth the governing legal principles.  The federal officer removal statute "aims to protect the Federal Government from interference with its operations, primarily by providing a federal forum for a federal defense." *NY1* Order at 3 (internal quotations and citations omitted).  A private defendant seeking to remove a case under the statute must show (1) that it was a "person acting under" a federal officer, *see e.g.*, *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007); *Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 209 (4th Cir. 2016); (2) that it has a "colorable federal defense," *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999); and (3) that the charged conduct was carried out for or in relation to the asserted official authority. *NY1* Order at 3.  "In reviewing removal on a motion to remand, the Court should reject a 'narrow, grudging interpretation of the statute, recognizing that one of the most important reasons for removal is to have the validity of the defense of official immunity tried in federal court.'" *Id.* (*quoting Acker*, 527 U.S. at 431).

Removal rights under the federal officer removal statute are much broader than under the general removal statute.  Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal question element is met if the defense depends on federal law." *Acker*, 527 U.S. at 430–31.  A removing defendant need only demonstrate that its federal defense is "colorable," that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 815 (3d Cir. 2016) (alteration in original, citation omitted).  A defendant "need not win his case before he can have it removed." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).  "[N]either the parties nor the district courts should be required to engage in fact-intensive

motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo v. Crane Co.*, 771 F.3d 113, 116 (2d Cir. 2014). "A court does not determine credibility, weigh the quantum of evidence or discredit the source of the defense at this stage. Instead, [the court] only determines whether there are sufficient facts alleged to raise a colorable defense." *Kraus v. Alcatel-Lucent*, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) (internal quotation marks omitted).

This lenient standard applies even where, as here, the plaintiff moving to remand offers disputed extrinsic evidence contesting the defendant's factual basis for removal. "To the extent that [a plaintiff's] competing testimony challenges the accuracy or reliability of [a defendant's] evidence, it does not undercut [the defendant's] right to removal, but rather raises the very type of factual dispute about the validity of the defense that should be submitted to the judgment of a federal court." *Papp*, 842 F.3d at 811 n.4 (quoting *Cuomo*, 771 F.3d at 116); *see also Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 139 (2d Cir. 2008) ("the purpose of the statute is to secure that the validity of the defense will be tried in federal court"). A defendant that has removed a case under the federal officer statute does not need to prove the factual allegations supporting removal by a preponderance of the evidence; it is enough that the allegations are *plausible*. *See, e.g.*, *In re Asbestos Litig.*, 2016 WL 452309, at *4 (D. Del. Feb. 5, 2016) ("the preponderance standard does not apply"), *report and recommendation adopted sub nom. Esser v. CBS Corp.*, 2016 WL 754079 (D. Del. Feb. 24, 2016). And "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010).[4] In that situation, it may be "possible that further proceedings will demonstrate that

---

[4] "Indeed, the term 'plausible' is generally used differently in the Section 1442(a)(1) context than in cases determining whether a complaint should be dismissed under Rule 12(b)(6) in accordance with *Twombly* and its progeny. . . . The latter standard, which defines plausible factual allegations as those that go beyond the speculative level, seems more exacting than that required by many courts deeming a colorable defense a plausible one when evaluating whether to grant a plaintiff's motion to remand." *Hagen*, 739 F. Supp. 2d at 780 n.9 (citation omitted).

Defendant is in fact not entitled to a government contractor defense based on Plaintiffs' theory." *Bouchard v. CBS Corp.*, 2012 WL 1344388 at *11 n.10 (E.D. Pa. Apr. 17, 2012). But when a case is at this stage, a "Defendant is not required to prove such facts. It is enough for removal pursuant to § 1442(a)(1) that a single affidavit viewed in the light most favorable to Defendant presents a plausible assertion that Defendant is entitled to a complete defense." *Id.*

## II.    Defendants Have Demonstrated a Plausible Basis for Federal Officer Removal.

The Notice of Removal ("Notice," ECF No. 264-4) sets forth facts satisfying each necessary element under the federal officer removal statute, as follows:

1.    Defendants are "persons" within the meaning of the statute. Notice ¶ 24. And in designing and manufacturing MilSpec AFFF, Defendants have "acted under" a federal officer. Specifically, Defendants have acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. For decades up to the time of removal, those specifications expressly required that MilSpec AFFF contain "fluorocarbon surfactants," which are PFAS compounds.[5] Further, the MilSpec AFFF products were subject to various tests by the United States Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the United States Department of Defense. Notice ¶ 27. *See*

---

[5]    In May 2019, the MilSpec was revised to drop the modifier "fluorocarbon" in front of "surfactant." But that had no practical effect on the MilSpec's requirement that those surfactants contain PFAS compounds. Under current technology, the only AFFF products capable of meeting the MilSpec's stringent performance requirements—and the only ones listed on the military's Qualified Product List—are those containing fluorocarbon surfactants. The 2019 MilSpec itself makes this clear: "The DoD's goal is to acquire and use a non-fluorinated AFFF formulation or equivalent firefighting agent to meet the performance requirements for DoD critical firefighting needs. The DoD is funding research to this end, but a viable solution may not be found for several years." MIL-PRF-24385F(SH) § 6.6 (2019). Thus, as a practical matter, the MilSpec still requires PFAS-containing surfactants.

*NY1* Order at 4 ("Because the U.S. military accepts and tests AFFF products against military specifications ('MilSpec') promulgated by Naval Sea Systems Command, including specifications that AFFF product formulations include the chemical class that includes PFOA/PFOS, Tyco has demonstrated that it was manufacturing the product under the U.S. military's guidance."); *Ayo v. 3M Company*, 2018 WL 4781145, at *7–10 (E.D.N.Y. Sept. 30, 2018) (holding that "acting under" requirement is satisfied by manufacturers' provision of MilSpec AFFF).

2.    Defendants have shown that they have a colorable federal defense for the provision of MilSpec AFFF, namely, the government contractor defense articulated in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512 (1988). The United States approved reasonably precise specifications for MilSpec AFFF; Defendants' MilSpec AFFF conformed to those specifications; and Defendants warned the United States about any dangers in the use of the product that were known to them but not to the United States. Notice ¶¶ 34–37. *See NY1* Order at 5 ("Tyco has demonstrated this colorable defense, where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications, which included specifications for the chemical class that includes PFOS/PFOA."); *Ayo*, 2018 WL 4781145, at *13–14.

3.    Finally, Ridgewood's claims seek to hold Defendants liable for conduct carried out for or in relation to the asserted official authority, satisfying the "causation" requirement of the federal officer removal statute. *NY1* Order at 5. The claims arise in part from releases of AFFF at various sites, of which the Complaint provides a non-exclusive list. *See* Compl. ¶ 67. Defendants allege that those AFFF releases include releases of MilSpec AFFF products that they have sold. In particular, to the extent PFAS are present in Ridgewood's water supply, that has resulted in part from the Teterboro Airport's use and discharge of MilSpec AFFF containing PFAS, which the airport is required to use. Notice ¶¶ 17–18. Ridgewood alleges that the presence of PFAS in such

products rendered them defective.  *See, e.g.*, Compl. ¶¶ 79–82.  The design choices Ridgewood is attempting to impose via state tort law would create a conflict between the choices reflected in the federal specifications and the supposed state-prescribed duty of care.  *See Boyle*, 487 U.S. at 509. In these circumstances, the causation requirement is readily met.  *See NY1* Order at 6 (causation requirement satisfied because "New York's claims arise out of use of AFFF products that it claims Tyco manufactured and sold, and for which the U.S. military imposes MilSpec standards."); *Ayo*, 2018 WL 4781145, at *9 ("[T]here is evidence of a 'casual connection' between the use of PFCs in AFFF and the design and manufacture of AFFF for the government.").

## III.    Ridgewood's Purported Disclaimers Do Not Undermine the Propriety of Removal.

Subject matter jurisdiction is tested as of the time of the filing of the complaint, *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 570–71 (2004), or, in a removed case, at the time of removal, *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 290–92 (1938). If jurisdiction exists at the time of removal, subsequent events cannot divest it.  *Id.* at 292–93. Here, Ridgewood's allegations remained unchanged between the filing of the Complaint and the date of removal.  Defendants properly removed this case based on those allegations and the facts alleged in the Notice of Removal.

Ridgewood asserts that removal was "improper," Memo. at 1, because in Paragraph 69 of the Complaint it "disclaimed any injury to its wells from AFFF that was used at any federally-regulated or military site," *id.* at 5.  That purported disclaimer, it contends, means there can be no causal link between its claims and Defendants' conduct taken at the direction of a federal officer. *Id.* at 19–20.

Paragraph 69, however, is not a "disclaimer" and must be read in conjunction with the immediately preceding paragraph:

> 68.    Ridgewood has diligently investigated known and potential sources of PFAS contamination in the District's wells and water supply. *Ridgewood cannot identify* any military or federally-regulated airport as a source of such PFAS contamination, *and on that basis* alleges that the PFAS contamination in its wells is not from such sources.
>
> 69.    There are no U.S. government military sites or federally-regulated facilities that are release sites/sources of contamination of Ridgewood's wells.

Compl. ¶¶ 68–69 (emphasis added). Those allegations are in no sense a "disclaimer" of claims or remedies. They do not preclude Ridgewood from seeking to hold Defendants liable for PFAS contamination originating from the use of MilSpec AFFF. They are merely a self-report on the status of Ridgewood's factual investigation and knowledge as of the date of the Complaint. Under the federal officer removal statute, jurisdiction may be based on the existence of a federal defense that is not apparent on the face of the complaint. *Acker*, 527 U.S. at 431. Thus, it is irrelevant that a complaint pleads ignorance of matters that could give rise to federal officer jurisdiction; the plaintiff's lack of knowledge does not prevent removal where the *defendant* alleges the requisite jurisdictional facts.[6]

In its motion to remand, Ridgewood now makes a more direct statement: "Ridgewood's claims do not arise from AFFF formulated or sold at the federal government's behest." Memo. at 1. But this language is insufficient to defeat removal for two reasons. First, it comes too late. Because jurisdiction is measured as of the time of removal, a post-removal declaration renouncing claims cannot force remand. *See, e.g.*, *St. Paul Mercury Indemnity*, 303 U.S. at 290–92; *Hunt v. DeVita, Inc.*, 680 F.3d 775, 777–78 (7th Cir. 2012). Second, courts have repeatedly held that disclaimers of this sort—even if made in the complaint—do not preclude removal under the

---

[6] Similarly, at various places Ridgewood argues that removal was improper because its Complaint alleges injuries only from "commercial" AFFF and not the MilSpec product. *See, e.g.*, Memo. at 14, 17–19. But this is just a quarrel with the settled proposition that federal officer removal jurisdiction may be based on facts offered by the defendant that appear nowhere in the complaint.

federal officer removal statute because they are "circular": their applicability "depends on a determination of the core question" of whether the defendant's conduct was in fact undertaken at the federal government's behest. *Marley v. Elliott Turbomachinery Co.*, 545 F. Supp. 2d 1266, 1274 (S.D. Fla. 2008). Defendants contend that their conduct giving rise to Ridgewood's alleged injuries *was* undertaken at least in part at the government's behest, and they "have the right to have this question decided in federal court." *Id.*; *see also In re Asbestos Prods. Liab. Litig. (No. VI)*, 770 F. Supp. 2d 736, 742 (E.D. Pa. 2011) (holding that plaintiffs' disclaimer purporting to exclude any claims "'caused by the acts or omissions of defendants committed at the specific and proven direction of an officer of the United States government acting in his official capacity,'" was "not effective to defeat Defendant's entitlement to a federal forum for the adjudication of the federal defense proffered"); *O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 54 n.6 (D. Mass. 2008) (denying remand notwithstanding disclaimer of "any cause of action or recovery for any injuries resulting from exposure to asbestos dust caused by any acts or omissions of a party committed at the direction of an officer of the United States Government"); *Machnik v. Buffalo Pumps Inc.*, 506 F. Supp. 2d 99, 103 n.1 (D. Conn. 2007) (denying motion to remand because "even artful pleading around any federal claims cannot defeat federal subject matter jurisdiction"); *Ballenger v. Agco Corp.*, 2007 WL 1813821, at *2 (N.D. Cal. June 22, 2007) (denying motion to remand despite plaintiff's disclaimer of "any claim arising from any act or omission of the United States, . . . or a claim against any other person or entity that is based on an act that was performed under specific direction of the United States, any agency thereof or any Officer of the United States").[7]

---

[7] *Washington v. Monsanto Co.*, 274 F. Supp. 3d 1125 (W.D. Wash. 2017), the only case Ridgewood cites in support of its disclaimer argument, is readily distinguishable. First, the very brief discussion of the "disclaimer" in that case came not in connection with federal officer removal but, rather, federal enclave (federal question) jurisdiction. The latter basis for jurisdiction differs

IV.    **Defendants "Act[ed] Under" Federal Authority in Designing and Manufacturing MilSpec AFFF Used at Teterboro Airport.**

Ridgewood acknowledges that Teterboro Airport, as a Part 139 facility, "is subject to a Federal Aviation Administration ('FAA') Airport Certification requirement that certain airports purchase only MilSpec AFFF after 2006." Memo. at 6. But Ridgewood claims that Defendants were not "acting under" federal authority in manufacturing MilSpec AFFF used at Teterboro, because that airport is a "non-federal consumer[]." That argument lacks merit.

The phrase "acting under" is "broad" and should be "liberally construed" in favor of the removing defendant. *Watson*, 551 U.S. at 147. When a private entity is involved, "acting under" is interpreted to "contemplate a relationship where the government exerts some 'subjection, guidance, or control'" over that entity. *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017) (*quoting Watson*, 551 U.S. at 151); *see also NY1* Order at 4.

In *NY1*, the Court concluded that "[b]ecause the U.S. military accepts and tests AFFF products against military specifications ('MilSpec') promulgated by Naval Sea Systems Command, including specifications that AFFF product formulations include the chemical class that includes PFOA/PFOS, Tyco has demonstrated that it was manufacturing the product under the U.S. military's guidance." *NY1* Order at 4. That analysis—which does not depend at all on who buys the MilSpec AFFF or where it is ultimately used—controls here as well.[8]

---

critically from federal officer jurisdiction in that (a) the jurisdictional inquiry is limited to matters appearing on the face of the complaint, and (b) there is no rule of liberally construing the facts in favor of removal. Second, the defendant's theory of federal enclave jurisdiction there was based on a legal impossibility: The plaintiff State had no standing to recover damages relating to a federal enclave. *Id.* at 1132. The State's "disclaimer" did not implicate factual issues; it consisted of nothing more than the State's observation that it lacked standing in that regard.

[8]   The factual materials evidencing the U.S. military's role in creating the specifications for MilSpec AFFF and overseeing compliance with those specifications were filed with Defendants' opposition to the State's motion to remand in *NY1*.  *See* May 13, 2019 Declaration of

The "acting under" requirement is satisfied by the government's role in the *design and manufacture* of MilSpec AFFF, not any subsequent role the government may have in buying or using the product.  The government need only exercise "some" subjection, guidance, or control over the manufacturer, *Sawyer*, 860 F.3d at 255, not control over the entire life cycle of its product.  Whether MilSpec AFFF is ultimately used at a military facility or a Part 139 airport, the U.S. military's role in the design and manufacture of the product is the same—it dictates the specifications and tests manufacturers' products to ensure that they comply with those specifications.

The military requires that MilSpec AFFF contain "surfactants" made up of PFAS compounds.  *See supra* n. 5.  The government's role in developing the military specifications and testing MilSpec AFFF to ensure compliance is sufficient "subjection, guidance, or control" to satisfy the "acting under" requirement regardless of whether a particular lot of MilSpec AFFF ends up on a military base, a Navy ship, or a Part 139 airport.  The government's involvement has already occurred before the MilSpec AFFF leaves the manufacturer's facility.

"[C]ourts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it manufactured for the government."  *Sawyer*, 860 F.3d at 255.  Notably, *Sawyer* does not suggest that the "acting under" element requires that equipment be manufactured *solely* for sale to the government. Defendants have indisputably manufactured MilSpec AFFF "for the government."  *See Ayo*, 2018 WL 4781145 at *9 (describing development of MilSpec AFFF and noting that MilSpec AFFF is a mission-critical product that, without the support of private contractors, "the Government would

---

L. Montgomery and attached Exhibits 1–21 (ECF No. 89).  Defendants incorporate those materials by reference.

have had to produce itself").  The fact that manufacturers sold some of their output of MilSpec AFFF to non-military Part 139 airports like Teterboro Airport (which are required to use it by FAA federal directive) does not alter the fundamental character of the material as a military product manufactured to military specifications.  Presumably it would be open to the government to decree that Part 139 airports must obtain their stock of MilSpec AFFF from military supply depots, in which case Ridgewood's argument here would clearly fail.  It exalts form over substance to suggest that the outcome should be different because, in effect, the middleman (the military) is eliminated and the Part 139 airports (like Teterboro) acquire MilSpec AFFF directly from the Defendants or their civilian distributors.  *See, e.g.*, *Timberline Air Serv., Inc. v. Bell Helicopter-Textron, Inc.*, 884 P.2d 920, 929 (Wash. 1994) (citing *Glassco v. Miller Equip. Co.*, 966 F.2d 641 (11th Cir. 1992)) ("There is no dispute on appeal that the helicopter was a piece of military equipment manufactured according to precise government design specifications.  The fact that the helicopter was later transferred to a private party does not preclude applicability of the [government contractor] defense.").  Application of the federal officer removal statute does not depend on the details of sales transactions but, rather, on the existence of a federal role in the design and manufacture of the product.

*Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095 (9th Cir. 2018), on which Ridgewood relies, is inapposite.  Unlike here, there was no suggestion in that case that the equipment at issue was made to government specifications or was otherwise manufactured or tested under government guidance.

Ridgewood also cites *Watson* in passing, but *Watson* is irrelevant to the "acting under" analysis here.  The issue in this case is not, as in *Watson*, mere compliance with federal regulations imposed on a private-party defendant's own activities.  *See Watson*, 551 U.S. at 145 ("The question

before us is whether the fact that a federal regulatory agency directs, supervises, and monitors a company's activities . . . brings that company within the scope of [the 'acting under' element of the federal-officer removal statute].").  Rather, Defendants complied with the U.S. military's product specifications and testing requirements in designing and manufacturing MilSpec AFFF.  In that connection, the federal authority that Defendants have "act[ed] under" is not that of the FAA but that of the Department of Defense.  Defendants satisfy the "acting under" element by virtue of the role of the Department of Defense in overseeing the design and manufacture of MilSpec AFFF even before the product ever gets to a Part 139 airport.  "The assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks."  *Watson*, 551 U.S. at 153.

Moreover, *Watson* does not preclude Defendants from having "act[ed] under" the FAA itself.  In effect, by requiring use of MilSpec AFFF at Part 139 airports, the FAA adopted the U.S. military's product specifications and testing requirements.  By supplying Part 139 airports like Teterboro with MilSpec AFFF, Defendants acted under the Government's "subjection, guidance, or control," and directly helped the FAA to fulfill *its* governmental task of implementing federal law and protecting the public interest at certain federally significant airports.[9]  *See Watson*, 551 U.S. at 153; *cf. Bennett v. MIS Corp.*, 607 F.3d 1076, 1088 (6th Cir. 2010) (quoting *Watson*, 551 U.S. at 153) ("Unlike the cigarette manufacturer in *Watson*, MIS's assistance went beyond 'simple compliance with the law.'  MIS helped FAA officers carry out . . . 'a job that, in the absence of a

---

[9] In clarifying that the requirement to purchase MilSpec AFFF was mandatory, the FAA explained: "There are several reasons for using MIL-F-24385 AFFF.  AFFF meeting the Military Specification will always be compatible with other Military Specification AFFF no matter the manufacturer. . . . AFFF meeting the Military Specification requires less agent when extinguishing a fire of the same size.  [And] the requirement to use the Military Specification is in concert with the National Fire Protection Association National Fire Code 403, paragraph 5.1.2.1."  Exhibit 1 to Defs.' Response to New York's Mot. to Remand (ECF No. 303-1) at 2.

contract with [MIS] . . . the [FAA] itself would have had to perform.'"). Defendants did not simply manufacture and sell a product in compliance with federal regulations, as in *Watson*. Thus, removal of this action based on sales of MilSpec AFFF to Teterboro Airport is particularly appropriate.

In effect, Ridgewood asks the Court to conclude that, although Defendants are acting under government authority when they manufacture MilSpec AFFF that is later used at military facilities, they are *not* acting under government authority when they produce the very same material that is later used at Part 139 airports by direction of a different federal agency—as if sales to the airports somehow erase, *nunc pro tunc*, the government's prior involvement in the process. That view makes no sense and has no basis in the law.

## V.    It Is Plausible that PFAS from MilSpec AFFF Used at Teterboro Airport Has Affected Ridgewood's Water Supply and Contributed to Its Claimed Injuries.

Ridgewood argues, relying on the declaration of its proffered expert David Terry (ECF No. 264-8), that there is no causal nexus between its claims and Defendants' provision of MilSpec AFFF used at Teterboro Airport because no PFAS from Teterboro "could reach Ridgewood's wells," Memo. at 2, and Defendants' factual allegation to the contrary are "demonstrably false," *id.* at 20. This is a disputed issue of fact. Defendants have a plausible factual basis for the allegation that PFAS from AFFF use at Teterboro has reached Ridgewood's water supply. That is all that is required in the current posture.[10]

Submitted with this brief is a declaration from John Connor, P.E., an expert in environmental engineering, with specialization in water resource protection, chemical fate and

---

[10]  Ridgewood also contends that Defendants have no colorable government contractor defense in this case, Memo. at 23–25, but it acknowledges that this argument "collapses into the causal nexus analysis," *id.* at 23.

transport in the environment, human and ecological risk assessment, environmental remediation, and permitting.  Mr. Connor has almost 40 years of experience in the field, and has investigated the impacts of chemical exposures (including PFAS) on water wells and surface water bodies that serve as a water supply.  Connor Decl. ¶¶ 2–4.  He has served as a technical consultant to the New Jersey Department of Environmental Protection (NJDEP), under sponsorship of the EPA, to assist in development of soil and groundwater remediation criteria.  *Id.* ¶ 5.

As explained in Mr. Connor's declaration, "based on the information available at this point, it is plausible that aqueous film-forming foams (AFFF) released at Teterboro Airport is a source of some PFAS that has reached water supplies used by Ridgewood Water."  Connor Decl. ¶ 6. Several facts support that conclusion.

First, as Ridgewood acknowledges, the FAA requires Teterboro Airport to use MilSpec AFFF, which contains PFAS.[11]  Storage and use of AFFF can result in release of the material into the environment and cause PFAS to enter soil, surface water runoff, and groundwater.  *Id.* ¶¶ 10–11.  Teterboro is known to have experienced fire incidents, including one in 2017, that would have involved the discharge of AFFF.  *Id.* ¶ 12.

Second, Teterboro Airport is located within the service boundaries of the Suez Water New Jersey Hackensack water system ("Suez Water").  *Id.* ¶ 19.  Suez Water supplies water to Ridgewood.  Compl. ¶ 8.  The groundwater underlying Teterboro Airport is part of the Passaic Formation, also known as the Brunswick Aquifer, which is the same aquifer from which

---

[11]  Without offering any contrary evidence, Ridgewood remarks in passing that "it is not even certain that Teterboro in fact used AFFF containing PFOA and PFOS," because "while MilSpec has always required that AFFF contain 'fluorocarbon surfactants,' of which there are hundreds, it has never required the use of PFOA and PFOS specifically."  Memo. at 6.  But Ridgewood elsewhere acknowledges that "PFOA and PFOS were also historically present in . . . MilSpec AFFF."  *Id.* at 1.  In any event, Ridgewood's claims relate to "PFAS" generally, "including but not limited to" PFOA and PFOS.  Compl. ¶ 1.  All fluorocarbon surfactants are PFAS.

Ridgewood, the Suez Water system, and other nearby, interconnected water departments draw groundwater for use as a drinking water supply.  Connor Decl. ¶ 13.  Based on investigation and characterization of groundwater contamination beneath the airport property (involving substances other than PFAS), the NJDEP has identified at least two areas where groundwater flow in the Brunswick Aquifer has been measured and shown to be toward the north-northwest.  *Id.* ¶ 15.  Thus, the measured groundwater flow beneath the airport is toward the portions of this same aquifer from which Ridgewood and the Suez Water system draw groundwater.  *Id.* ¶ 17; *see also id.*, Figure 1.

Third, groundwater in the Brunswick Aquifer is transmitted in fractures, joints, and solution channels.  *Id.* ¶ 24.  Aquifers can be continuous for thousands of feet in the direction of "strike," *i.e.*, the orientation of the principal fracture planes in the rock.  *Id.*  At one location between Ridgewood's service area and Teterboro Airport, the U.S. Geological Survey reported an average strike direction of N9E, which is towards the N-NE/S-SW.  *Id.* ¶ 27.  Consistent with that finding, at another location between Ridgewood's service area and Teterboro Airport, groundwater flow was found to be toward the northeast.  *Id.* ¶ 28.  A northeasterly direction of flow would convey groundwater from Teterboro toward the water sources used by Suez Water.  *See id.*, Figure 1.

Fourth, in northern New Jersey water utilities are linked by a complex set of interconnections.  In addition to drawing water from its own wells, Ridgewood obtains water directly from three other utilities (one of which is Suez Water) and indirectly from up to nine other utilities.  *Id.* ¶ 21.  Although no public utilities directly tap into the groundwater at or near the Teterboro Airport, any PFAS in the Brunswick Aquifer originating at the airport "could reasonably pose a threat to the groundwater sources of these water departments."  *Id.* ¶ 23.  Further, "[t]his threat cannot be

scientifically ruled out without further field and laboratory investigations addressing, at a minimum, the degree and extent of groundwater contamination, the complex groundwater flow patterns to the north and northwest of the airport, the interaction of these groundwater flows with the water supply wells of the various water departments, and the water exchanges among these various water departments." *Id.*

Finally, that Teterboro Airport is a source of PFAS affecting Ridgewood's water supply is at least as plausible as Ridgewood's own allegation that its water has been contaminated by PFAS from the Saint-Gobain Performance Plastics facility in Wayne, New Jersey, several miles away. *See* Compl. ¶ 65.  Ridgewood's declarant Mr. Terry describes a Rube Goldberg-like sequence of pathways by which it is "plausible" that PFAS from Saint-Gobain could reach Ridgewood's water supply.  Terry Decl. ¶¶ 27–28.  But as Mr. Connor explains, Mr. Terry's theory relies on a lengthy chain of assumptions, none of which Mr. Terry supports with facts.  Connor Decl. ¶¶ 38–40.  "Just as the necessary quantitative data are not currently available to prove or disprove the mechanisms suggested by Mr. Terry for PFAS transport from the Saint-Gobain facility to the Ridgewood Water system, other potential sources within a similar radius of inquiry have not been proven or disproven, based upon appropriate consideration of requisite quantitative data.  Those include the Teterboro Airport . . . .  [B]ased on the information currently available, Teterboro is no less plausible a source of PFAS contamination of Ridgewood's water supply than the Saint-Gobain facility." *Id.* ¶ 41.

In sum, "[b]ased on available hydrogeological data at and near Teterboro Airport, ground-water flow is towards the north/northwest, which is in the direction of the primary water sources utilized by Suez Water.  In the absence of further detailed, site-specific information, it is plausible, based on the information presented here, that PFAS constituents released at Teterboro Airport have

been incorporated into the water supply system of Suez Water or other water systems and thus enter the water distribution system of Ridgewood Water, either via groundwater flow from Teterboro Airport to the principal reservoirs, or via the interconnected system of water purveyors in this area of New Jersey." *Id.* ¶ 34.

Ridgewood's argument that AFFF use at Teterboro Airport could not possibly be a source of PFAS in its water supply relies crucially on Mr. Terry's assertion that the flow of groundwater in the vicinity of the airport, Ridgewood's service area, and the Suez Water's source area is "from north to south." Terry Decl. ¶ 17; *see also id.* ¶¶ 18–21. But as Mr. Connor notes, Mr. Terry cites no field data for that assertion. Connor Decl. ¶ 31. The only source he cites (*see* Terry Decl. ¶ 17 n.3) is a *computer modeling study* pertaining to an entirely different part of New Jersey. More specifically, "the paper describes a numerical modeling study for an area located along Beden Brook near Hopewell, New Jersey at a distance of approximately 40 miles from Teterboro Airport and the boundary of the Ridgewood Water service area (see Figure 3)." Connor Decl. ¶ 31. The paper does not show actual groundwater flow to be from north to south. *Id.* ¶ 32. Rather, it observes that groundwater flow is influenced both by topography and by underlying structural characteristics, with considerable variability among sites, and that conceptual models must be based on the hydrostratigraphy of each site. *Id.* Accordingly, without validation by local hydrogeological data for the specific area, the modeling study that Mr. Terry cites cannot reliably support any opinion about the direction of groundwater flow relevant here. *Id.* ¶ 31.

In short, the direction of groundwater flow in the relevant area is a disputed issue of fact that goes to the merits of the lawsuit and is not appropriate for resolution on a motion to remand. Whether PFAS-containing groundwater from Teterboro Airport more likely than not reached Ridgewood's water supply is an issue for another day. At this stage, Defendants need only

present a plausible basis connecting MilSpec AFFF use at Teterboro Airport to plaintiffs' alleged injuries in order to be entitled to litigate their federal defense in the federal forum Congress provided through § 1442(a)(1). *See, e.g.*, *Papp*, 842 F.3d at 811 n.4; *Cuomo*, 771 F.3d at 116.

## CONCLUSION

The Court should deny the motion to remand.  Defendants have presented facts supporting a colorable basis for removal under the federal officer removal statute.  Ridgewood seeks to litigate the merits of hydrogeology and other complex expert issues in the context of a motion to remand, but courts have repeatedly held that it is inappropriate to address such issues at this stage of the case.

DATED:  September 17, 2019                     Respectfully submitted,


                                    By:      /s/ Amanda S. Kitts
                                             David E. Dukes
                                             Federal Bar No. 635
                                             E-Mail: david.dukes@nelsonmullins.com
                                             Amanda S. Kitts
                                             Federal Bar No. 9005
                                             E-Mail: amanda.kitts@nelsonmullins.com
                                             NELSON MULLINS RILEY &
                                             SCARBOROUGH LLP
                                             1320 Main Street / 17th Floor
                                             Post Office Box 11070 (29211-1070)
                                             Columbia, SC  29201
                                             (803) 799-2000

                                             Stephen D. Raber
                                             WILLIAMS & CONNOLLY LLP
                                             725 12th St. NW
                                             Washington, DC  20005
                                             Tel: (202) 434-5000
                                             Fax: (202) 434-5029
                                             sraber@wc.com

                                             *Counsel for Tyco Fire Products, LP &
                                             Chemguard, Inc.*